Ruth Rizkalla, Esq., State Bar No. 224973

*rrizkalla@carlsonattorneys.com*

THE CARLSON LAW FIRM, PC

1230 Rosecrans Avenue, Suite 500

Manhattan Beach, CA 90266

Tel:   (254) 526-5688

Fax:   (254) 526-8204

*(Additional Counsel on Signature Page)*

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHARYN CLARK,<br><br>Plaintiff,<br><br>v.<br><br>BOSTON SCIENTIFIC CORPORATION; BOSTON SCIENTIFIC NEUROMODULATION CORPORATION; and UNITED STATES FOOD AND DRUG ADMINISTRATION<br><br>Defendants. | **COMPLAINT FOR DAMAGES ACTION AND ACTION SEEKING NATIONWIDE RELIEF**<br><br>**Case No. 2:26-cv-2789**<br><br>**DEMAND FOR JURY TRIAL** |

- 1 -

## COMPLAINT

Plaintiff, by and through undersigned counsel, bring the Complaint against Defendants Boston Scientific Corporation, Boston Scientific Neuromodulation Corporation, and the United States Food and Drug Administration and alleges as follows:

## I.    PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff Sharyn Clark ("Ms. Clark" or "Plaintiff") is and was at all relevant times a resident of Tyler, Texas. Plaintiff was implanted with a spinal cord stimulator ("SCS") system designed, manufactured, and distributed by Defendant Boston Scientific Corporation.

2.    Defendant Boston Scientific Corporation ("Boston Scientific") is a corporation organized under the laws of the State of Delaware, and its principal place of business and global headquarters is in Marlborough, Massachusetts. Boston Scientific is registered and interacts with the Food and Drug Administration through its offices located at 25155 Rye Canyon Loop, Valencia, CA 91355. Boston Scientific conducts business nationwide and within the District, including marketing, selling, and distributing neuromodulation devices, such as its spinal cord stimulator systems marketed under the trade name Spectra WaveWriter.

3.    Defendant Boston Scientific Neuromodulation Corporation ("Boston Scientific Neuromodulation"), is formed under the laws of Delaware, with its stated principal place of business located in Marlborough, Massachusetts. Boston Scientific Neuromodulation conducts business nationwide and within this District, including the design, manufacture, regulatory submission, and distribution of Class III neuromodulation devices, such as its spinal cord stimulator systems marketed under the trade names Spectra WaveWriter, Precision Spectra, and other similar devices. However, its registered agents and listed authorized employees and functional principal place of business is actually 2710 Gateway Oaks Drive,

Sacramento, California. In addition, Defendant Boston Scientific Neuromodulation is registered with the FDA as the Specification Developer for the Spectra WaveWriter, the device at issue in this complaint, and other similar devices through its facilities located at 25155 Rye Canyon Loop, Valencia, CA 91355.  As the Specification Developer for the device at issue in this case, Boston Scientific Neuromodulation was responsible for the development and design of the device at issue, including crucial functions such as design validation, gap analysis, and coordination of Corrective and Preventive Actions ("CAPAs") required by the Food, Drug & Cosmetic Act.

4.    Defendant United States Food and Drug Administration (FDA) is an agency of the United States government responsible for regulating medical devices under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq., and its implementing regulations. The FDA is named solely in its official capacity for purposes of claims brought under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.

5.    Venue is proper in the District pursuant to 28 U.S.C. § 1391(b)(2) because venue is proper in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred. Venue is also appropriate with respect to the FDA under 28 U.S.C. § 1391(e)(1) because a substantial part of the events giving rise to the APA claims occurred in this District.

6.    Ther Court has subject matter jurisdiction over Plaintiff's claims against the FDA pursuant to 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000 and the parties are citizens of different states. The Court has supplemental jurisdiction over related state-law claims pursuant to 28 U.S.C. § 1367.

7.    Ther Court has personal jurisdiction over Boston Scientific because Defendant conducted such business within the State including acts which caused or

contributed to Plaintiff's injuries. The Plaintiff's claims for damages arise from Boston Scientific's activity in, and contacts with, the state of Texas.

## II.   FACTUAL ALLEGATIONS REGARDING BOSTON SCIENTIFIC SCS DEVICES AND REGULATORY HERTORY

### A.   Overview of Spinal Cord Stimulation Devices and Their Intended Use

8.   SCS devices are Class III implantable neuromodulation systems designed to deliver electrical impulses to the spinal cord to mask or modulate chronic intractable pain. SCS systems typically consist of an implantable pulse generator (IPG), one or more electrical leads, and external patient controllers for adjusting therapeutic levels.

9.   The underlying therapeutic premise of SCS devices is that electrical stimulation of the dorsal columns can "override" or "mask" the transmission of pain signals to the brain, thereby providing relief for chronic pain conditions that are otherwise resistant to conventional treatments.

10.   SCS devices have long been associated with complex risks, including but not limited to device migration, lead breakage, battery failure, infection, stimulation-induced neurological deficits, exacerbation of pain, and autonomic dysfunction.

11.   Due to these inherent risks, SCS devices are classified by the FDA as Class III medical devices, requiring Premarket Approval ("PMA") or PMA supplement review for any design or functional changes affecting the safety and effectiveness of the device.

12.   These devices are also associated with significant complications and poor clinical results including inadequate effectiveness in providing the pain relief they promise. In September 2020, in response to a Public Citizen report, the FDA issued a letter to healthcare providers advising that, during the preceding four-year

period, it had received 107,728 adverse event reports regarding spinal cord stimulators. The letter also disclosed 30,321 reports of unsatisfactory pain relief.

**B.  Boston Scientific's Device Portfolio and Regulatory Approval History**

13.  The Federal Food, Drug & Cosmetic Act ("FDCA") sets forth the requirements for Premarket Approval, which is necessary for the commercialization of a high-risk Class III device such as the device at issue in the case.

14.  Among the aforesaid requirements is the requirement to provide the FDA with adequate clinical data to support the finding of sufficient safety and efficacy of the subject device.

15.  The FDCA's implementing regulations require that an applicant for premarket approval of a device submits, with respect to the device proposed to be marketed:

results of the clinical investigations involving human subjects with the device including clinical protocols, number of investigators and subjects per investigator, subject selection and exclusion criteria, study population, study period, safety and effectiveness data, adverse reactions and complications […]

16.  Boston Scientific's entire spinal cord stimulator product line originates from, and is for all intents and purposes, predicated on PMA P030017, initially approved by the FDA in 2004 for its Precision Spinal Cord Stimulator System. This includes the Spectra WaveWriter SCS.

17.  PMA P030017 was awarded despite the applicant's failure to supply the data required by 21 CFR §814.20.

18.  Instead, the referenced PMA was granted following submission of clinical data from "available peer reviewed published literature for similar implantable spinal cord stimulation (SCS) systems."

19.  Boston Scientific did not submit, and the FDA did not consider, clinical data or clinical evidence for the Precision system, or for any subsequent

BSC system, like the Spectra WaveWriter, that used the Precision as a predicate product for marketing purposes.

20. Thus, the defining parameter for the grant of premarket approval of a medical device has never been met with respect to the device at issue in the case, or any other Boston Scientific SCS system for that matter.

21. Since the original approval of P030017, Boston Scientific has introduced numerous subsequent models and upgrades under PMA supplements, including the Precision Plus, Precision Spectra, Spectra WaveWriter, WaveWriter Alpha, and Precision Montage systems.

22. Since the original approval of P030017, Boston Scientific has filed 362 supplements to P030017.

23. Boston Scientific's newer generations of devices incorporated significant modifications, including multiwaveform stimulation (simultaneous tonic, burst, and sub-perception modes), posture-adaptive programming, expanded electrode arrays, and major revisions to battery architecture and lead designs.

24. None of these systems are supported by premarket clinical data supporting safety or effectiveness.

25. Boston Scientific aggressively marketed its Precision Spectra system and other upgraded models as offering superior pain relief through innovative stimulation patterns, despite the absence of independent premarket clinical testing validating the long-term safety and effectiveness of these substantial modifications.

C. **Material Changes to Device Architecture and Functionality**

26. Over time, Boston Scientific introduced substantial modifications to the originally approved Precision SCS system, including:

- The addition of simultaneous multiwaveform stimulation, including tonic, burst, and sub-perception programming;

- The redesign of the implantable pulse generator battery system and revision to communication capabilities;
- The integration of posture-adaptive stimulation algorithms;
- The expansion of lead configurations and multi-source current delivery systems.

27. These substantial modifications materially altered the device's safety and effectiveness profile compared to the originally approved Precision system, triggering regulatory obligations that Boston Scientific failed to fulfill.

28. Under 21 C.F.R. § 814.39(a), such significant changes require submission of a new PMA or substantial clinical data demonstrating continued safety and effectiveness. Boston Scientific failed to pursue a new PMA review for these cumulative design changes and failed to provide substantial clinical data demonstrating continued safety and effectiveness, and instead improperly utilized the PMA supplement pathway.

29. The Spectra WaveWriter SCS was "approved" by the FDA through Supplement S305 to PMA P030017.

30. In a January 11, 2018 press release, Boston Scientific described the Spectra WaveWriter system as "industry leading SCS technology."

31. The Spectra WaveWriter implanted in Plaintiff is technologically unrecognizable from the Precision system that was originally approved by the FDA in 2004.

32. Exemplifying the significant changes Boston Scientific has improperly made to its SCS systems over the years, it currently advertises and markets three distinct systems on its website – the Precision Montage, Spectra WaveWriter, and the WaveWriter Alpha systems. Boston Scientific advertises and markets these systems as distinct from each other. Despite advertising three distinct systems, and several others over the years, it has only ever received one PMA approval.

33.    Throughout its history in the neuromodulation space, Boston Scientific has conflated the PMA approval process with the less onerous and demanding 510k clearance process.

### D.    Regulatory Manipulation and Abuse of the PMA Supplement Process

34.    Boston Scientific submitted successive PMA supplements treating major modifications as discrete "minor" changes to avoid the heightened scrutiny, public transparency, and rigorous independent clinical evaluation required for new PMA applications.

35.    Ther regulatory strategy deprived physicians, patients, and the FDA of complete information necessary to evaluate the true risks associated with the modified devices, particularly in the areas of neurological safety, device longevity device effectiveness, stimulation safety, and autonomic complications.

36.    As a direct consequence of these omissions and regulatory manipulations, the Spectra WaveWriter and other successor systems entered the market and were widely implanted without sufficient scientific validation of their safety and effectiveness.

### E.    Post-Market Failures, Adverse Events, and Concealment of Risks

37.    Publicly available MAUDE (Manufacturer and User Facility Device Experience) database entries, peer-reviewed studies, and post-market surveillance data demonstrate that Boston Scientific's SCS systems are associated with serious complications, including:

- Unsatisfactory pain relief;

- Device migration and loss of therapeutic coverage;

- Lead fractures requiring surgical revision;

- Battery depletion and communication failures;

- Stimulation-induced autonomic dysfunction, including urinary incontinence and orthostatic hypotension;

- Persistent ineffective pain relief despite extensive reprogramming.

38. Peer-reviewed literature has increasingly associated SCS therapy, particularly multiwaveform stimulation platforms like the Precision Spectra, with unexpected autonomic side effects. *See*, e.g., Steven Smeijers et al., Spinal Cord Stimulation and Urinary Dysfunction, 23 Pain Med. 1204, 1204–1216 (2022).

39. A 2023 Cochrane Review led by University of Sydney researchers found that, based on all randomized controlled trials and cross-over trials comparing SCS with placebo or no treatment for low back pain, current evidence suggests that SCS probably does not have sustained clinical benefits that would outweigh the costs and risks of the surgical intervention. *See* Traeger AC, Gilbert SE, Harris IA, Maher CG. Spinal cord stimulation for low back pain. Cochrane Database of Systematic Reviews 2023, Issue 3. Art. No.: CD014789. DOI: 10.1002/14651858.CD014789.pub2. Accessed 08 January 2026.

40. Despite knowing of these adverse outcomes, Boston Scientific failed to timely update device labeling, issue field safety notices, timely file adverse event reports, or seek revised PMA approvals as required under federal regulations.

41. Of note, Boston Scientific has never conducted randomized, double-blind, placebo-controlled studies on any of its SCS devices.

42. Plaintiff's injuries occurred as a direct and foreseeable result of Defendant Boston Scientific's conduct and the FDA's arbitrary and capricious regulatory approvals as set forth herein.

## III. REGULATORY FRAMEWORK AND DUTIES

43. Spinal cord stimulator (SCS) systems are regulated as Class III medical devices under the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 et seq., and the Medical Device Amendments of 1976 ("MDA"), 21 U.S.C. § 360c et seq.

44. Class III devices are those that present the highest risk to patients and are subject to the most rigorous form of regulatory oversight, including the requirement to obtain Premarket Approval from the FDA prior to marketing. *See* 21 U.S.C. § 360e.

45. To obtain PMA, a manufacturer must submit detailed information demonstrating the safety and effectiveness of the device, including clinical trial data, descriptions of manufacturing methods, proposed labeling, and a risk-benefit analysis. *See* 21 C.F.R. § 814.20.

46. Once a PMA is granted, any proposed changes to the device's design, labeling, intended use, or manufacturing process must be submitted to the FDA as a PMA supplement. *See* 21 C.F.R. § 814.39(a).

47. The MDA distinguishes between different types of PMA supplements based on the nature and significance of the change. A "panel-track supplement" is required for changes that affect the safety or effectiveness of the device, such as new indications for use, major design modifications, or significant changes in component materials. *See* 21 C.F.R. § 814.39(c).

48. For any change that could affect safety or effectiveness, the FDA must receive and approve the PMA supplement before the manufacturer implements the change. *Id.* The burden of proof remains with the manufacturer to demonstrate that the modified device continues to be safe and effective.

49. Manufacturers are also required to comply with post-market surveillance and reporting obligations, including:

- Timely submission of adverse event reports under 21 C.F.R. § 803.50;
- Maintenance of complaint files under 21 C.F.R. § 820.198;
- Evaluation of nonconforming products under 21 C.F.R. § 820.90;

- Implementation of corrective and preventive actions under 21 C.F.R. § 820.100.

50.     These regulatory obligations are non-discretionary and enforceable under both federal and state law. A manufacturer's failure to comply with these requirements renders its device adulterated or misbranded under 21 U.S.C. §§ 351 and 352.

51.     Additionally, under the APA, 5 U.S.C. §§ 701–706, FDA actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law are subject to judicial review.

52.     The FDA's passive acceptance or failure to meaningfully review Boston Scientific's PMA supplements—particularly where those supplements concealed the scope and safety implications of the changes—constitutes agency action unlawfully withheld and final agency action subject to review under 5 U.S.C. §§ 706(1), 706(2)(A)–(D).

53.     Plaintiff does not seek to enforce the FDCA directly. Rather, Plaintiff asserts state-law tort claims based on duties that parallel and incorporate federal requirements, as recognized in *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996), and as preserved under 21 U.S.C. § 360k(a).

54.     These state-law claims are not preempted by the MDA because they are premised on conduct that violates both federal law and equivalent duties imposed by Texas law. Plaintiff also seeks judicial review under the APA for final agency action by the FDA that facilitated or failed to correct the wrongful acts of Defendant Boston Scientific.

## IV.  ALLEGATIONS AGAINST THE FDA UNDER THE ADMINISTRATIVE PROCEDURE ACT

55.  Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

56.  Defendant United States Food and Drug Administration is an agency of the United States government charged with ensuring that medical devices marketed in the United States are safe and effective for their intended use, pursuant to the FDCA, 21 U.S.C. § 301 *et seq.*, and the MDA, 21 U.S.C. § 360c et seq.

57.  Under the APA, 5 U.S.C. §§ 701–706, federal courts are authorized to review final agency actions, including agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. See 5 U.S.C. §§ 706(1), 706(2)(A)–(D); *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).

58.  The FDA's passive acceptance and approval of Boston Scientific's original PMA P030017 and numerous PMA supplements submitted by Boston Scientific Corporation for spinal cord stimulator devices under PMA P030017, including the Precision Spectra system implanted in Plaintiff, constituted final agency action within the meaning of the APA.

59.  In 2004, the FDA failed to require Boston Scientific to submit the clinical data required by 21 CFR §814.20 in support of PMA P030017.

60.  Instead, the FDA granted PMA P030017 despite Boston Scientific's failure to provide the required data, instead granting approval expressly based only on literature, not clinical data, for similar implantable spinal cord stimulation systems.

61.  The FDA also failed to require Boston Scientific to submit new Premarket Approval applications for substantial modifications to the original Precision SCS System, including:

- The addition of simultaneous multiwaveform stimulation (tonic, burst, sub-perception);
- The redesign of the IPG battery architecture;
- The integration of posture-adaptive stimulation algorithms;
- The expansion of lead configurations and multi-source current delivery systems.

62. By approving substantial cumulative changes via successive PMA supplements without requiring full panel-track review or independent clinical validation, the FDA unlawfully allowed Boston Scientific to materially alter the design, intended use, and safety profile of its spinal cord stimulator systems outside the bounds of statutory and regulatory requirements. *See* 21 U.S.C. § 360e(d); 21 C.F.R. § 814.39(a).

63. Essentially, the FDA allowed Boston Scientific to bring new Class III SCS products, including the original Spectra WaveWriter SCS and subsequent SCS products, to market based on predicate products. This process much more closely resembles the FDA's 510(k) premarket submission process than the Premarket Approval process. A critical difference between these two routes, however, is that the PMA process gives BSC the ability to raise federal preemption as a defense to Plaintiff's claims.

64. The FDA's acceptance and approval of Boston Scientific's original PMA P030017 and subsequent PMA supplements submitted by Boston Scientific constitutes "final agency action"[1] under 5 U.S.C. § 551(13) and 5 U.S.C. § 704. A "final agency action" is one that (1) marks the consummation of the agency's decision-making process and (2) determines rights or obligations or from which

---

[1]Under the Administrative Procedure Act, "agency action" includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," and final agency action is judicially reviewable when it consummates the decision-making process and determines rights or obligations or produces legal consequences. *See* 5 U.S.C. § 551(13); 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

legal consequences flow. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). The FDA's approval of PMA P030017 and subsequent PMA supplements was the final step in the regulatory process, authorizing the commercial marketing of spinal cord stimulators that were not supported by clinical evidence of safety or effectiveness, and subsequently, of materially modified spinal cord stimulator systems that were equally unsupported by clinical evidence of safety or effectiveness. This approval carried immediate and direct legal consequences, allowing Boston Scientific to market and distribute altered devices nationwide under federal premarket authorization, behind the legal shield of federal preemption. Plaintiff's Administrative Procedure Act claims challenge these final agency actions, not discretionary enforcement decisions or ongoing regulatory processes, and thus fall squarely within the scope of judicial review authorized by 5 U.S.C. §§ 702 and 706.

65.     The FDA's actions and omissions materially contributed to the injuries suffered by Plaintiff by enabling the marketing and widespread implantation of devices whose risks had not been fully evaluated or disclosed, depriving physicians and patients of critical safety information.

66.     The FDA's actions and omissions materially contributed to Plaintiff's legal injury, in that these actions and omissions allow Boston Scientific to invoke federal preemption to argue that Plaintiff should be barred from seeking redress for physical injuries caused by its SCS system.

67.     But for the FDA's actions and omissions, Boston Scientific would not have received PMA approval for the SCS system implanted in Plaintiff, and therefore, would not be able to invoke federal preemption to shield itself from liability for the physical injuries that the SCS system caused Plaintiff.

**A. Evidence of Agency Capture: ANA Reclassification Petition and FDA Override**

68.     In 2001, Advanced Neuromodulation Systems (ANS) submitted a petition to the FDA requesting that implantable spinal cord stimulators be reclassified from Class III to Class II devices. *See* FDA Docket No. 02P-0321.

69.     An FDA advisory panel, after reviewing the available scientific evidence, recommended granting the reclassification request, concluding that SCS devices did not warrant Class III treatment based on their risk profiles and clinical experience.

70.     Despite the advisory panel's recommendation, FDA headquarters overruled the panel. They unilaterally decided to maintain Class III classification for SCS devices, yet without imposing meaningful PMA enforcement obligations or new clinical evidence requirements thereafter.

71.     This historical regulatory decision is evidence of agency capture and arbitrary administrative conduct. The FDA simultaneously acknowledged that SCS devices did not merit full Class III regulatory burdens, yet failed to require proper PMA oversight for subsequent generations of increasingly complex and modified SCS systems.

72.     This agency capture is especially significant in the case of Boston Scientific's SCS product line, since PMA P030017 was approved without requiring any clinical data, after the FDA decided to maintain Class III classification for SCS devices.

73.     The FDA's passive and deferential treatment of Boston Scientific's original PMA Application and subsequent PMA supplements following the override of its advisory panel further illustrates systemic regulatory failure and arbitrary decision-making in violation of the APA.

74.     Plaintiff was injured as a direct and foreseeable result of the FDA's arbitrary and unlawful regulatory actions. Had the FDA properly enforced PMA

standards and statutory requirements, the Spectra WaveWriter device implanted in Plaintiff would not have entered the market at all, and certainly not in the materially altered form that was ultimately implanted in Plaintiff. Further, Boston Scientific would not be able to invoke the defense of federal preemption to shield itself from liability for the physical injuries that the Spectra WaveWriter caused Plaintiff.

75.     Plaintiff seeks judicial review of these final agency actions under the APA, including declaratory and injunctive relief as necessary to vindicate statutory rights, remedy the injury caused by the agency's conduct, and prevent ongoing harm to Plaintiff and the public.

## V.     PLAINTIFF-SPECIFIC ALLEGATIONS

76.     Plaintiff Sharyn Clark is a resident of Tyler, Texas. On February 14, 2019, Plaintiff underwent implantation of a Boston Scientific spinal cord stimulator system.

77.     The implanted system included a Spectra WaveWriter implantable pulse generator, along with Boston Scientific leads and anchoring components.

78.     Plaintiff's spinal cord stimulator was implanted for the treatment of chronic pain.

79.     Prior to deciding to have the Spectra WaveWriter system implanted, Plaintiff met with Boston Scientific sales representatives.

80.     Before being permanently implanted with the Spectra WaveWriter system, Plaintiff underwent a temporary spinal cord stimulator trial.

81.     Plaintiff was covered by Humana at the time she was implanted with the SCS system, and the cost of the SCS system was paid by Humana outside of regular $35 co pay fees every time Plaintiff went to the doctor.

82.     For Medicaid to pay for the cost of the SCS system, Plaintiff and her physician had to report a certain level of pain relief from the trial stimulator. Thus,

- 16 -

statements made to Plaintiff regarding the perceived effectiveness of the trial, and any purported predictions about the effectiveness of the permanent SCS system were critical to the insurance coverage of the very expensive permanent implant.

83. Prior to permanent implantation of the Spectra WaveWriter system, Plaintiff was advised by a Boston Scientific sales representative that the permanent SCS device would provide reliable, long-term pain relief and that stimulation was safe and localized. No warnings were given regarding the risk of shocking, the possibility that the permanent device differed materially from the external trial unit, or the likelihood that the SCS system would not provide meaningful, long-term pain relief. In fact, the Boston Scientific representative represented to Plaintiff that the permanent SCS system would provide equivalent pain relief to the temporary SCS trial, and would provide consistent long-term pain relief.

84. At the end of the SCS trial, Plaintiff reported greater than fifty percent pain relief.

85. Plaintiff and her providers were not informed that the original PMA that led to the Spectra WaveWriter system being on the market (PMA P030017) was not supported by clinical trial data or that it was approved based on literature relating to other spinal cord stimulator devices.

86. Plaintiff and her providers were also not informed that the Spectra WaveWriter system, which is a materially altered version of the original Precision Spectra system, including its multiwaveform stimulation capabilities and revised battery architecture, had not undergone independent clinical validation via a new PMA application, and instead reached the market through piecemeal PMA supplement filings.

87. Plaintiff relied on Boston Scientific's representations, through both direct promotional materials and the direct spoken representations by the Boston Scientific sales representatives in deciding to proceed with the initial implantation of the Spectra WaveWriter system,.

88.     Specifically, Plaintiff relied on Boston Scientific's representations, among others, that the Spectra WaveWriter system was uniquely suited to provide her with long-term pain relief and was safe for long-term implantation, that the system was supported by clinical data, and that the permanent SCS system would provide equivalent pain relief to the temporary SCS trial.

89.     The representations relied upon by Plaintiff are still being made by Boston Scientific about the Spectra WaveWriter to this day.

90.     Plaintiff's interactions with Boston Scientific's representatives were so substantial that Plaintiff alleges that they directly sold her the Spectra WaveWriter system.

91.     On or about February 14, 2019, Plaintiff underwent surgery to have the Spectra WaveWriter system implanted.

92.     A Boston Scientific representative was present at the surgery facility on the day of Plaintiff's permanent implant surgery, and programmed the device during the surgery.

93.     Plaintiff initially experienced positive results from the SCS system.

94.     However, on March 17, 2024 Plaintiff felt an uncomfortable sensation in her back. She felt as if the IPG had moved in her back, and was starting to move towards her skin.

95.     Plaintiff did not immediately go to the doctor because the pain was not that intense, so she personally monitored the situation. It was also about the time when she noticed that the spinal stimulator was not giving her pain relief anymore.

96.     By early June, Plaintiff noticed that the IPG had moved so much it had pierced her skin and was now exposed from her back. With an open wound, Plaintiff now went to the doctor to see what she should do.

97.     The doctor was concerned that there was an open wound in Plaintiff's back and immediately scheduled her for surgery.

98.     On June 20, 2024, Plaintiff had the surgery to remove the entire Spectra WaveWriter system. Because of the immediacy of the surgery, it is unknown if a Boston Scientific representative was at the explant surgery.

99.     On information and belief, had Plaintiff not had the Spectra WaveWriter system removed, Plaintiff would have died from the generator pulling the leads out of her back as they ripped the nerves from her spine.

100.    Despite having the Spectra WaveWriter system removed, the issues did not stop. Plaintiff was diagnosed with an infection and inflammatory reaction due to the neurostimulator on August 14th, 2024.

101.    The permanent Spectra WaveWriter system did not provide equivalent pain relief to Plaintiff's temporary SCS trial on a permanent basis, as the system has decreased in efficacy to the point that it provided no pain relief.

102.    The permanent Spectra WaveWriter system was advertised to be locked in place in her back, as time went on, the IPG

103.    During the time in which the SCS system was implanted in Plaintiff, Boston Scientific representatives, believed to be unlicensed in the State of Texas, or elsewhere for that matter, actively participated in programming and waveform selection. These actions involved real-time interpretation of patient responses and materially influenced the configuration and function of the implanted system. These actions were essentially medical treatment and had a significant impact on the way the SCS system affected Plaintiff's body.

104.    Plaintiff was advised that Boston Scientific representatives were the only individuals who could or would program or reprogram her SCS device.

105.    During the time in which the SCS system was implanted in Plaintiff, Boston Scientific representatives provided medical advice to her about the SCS system.

106.   Plaintiff's injuries, including physical pain, emotional distress, surgical trauma, loss of enjoyment of life, and the implantation of defective hardware, were directly and proximately caused by the acts and omissions of Boston Scientific.

## VI.   DEFENDANTS' MISREPRESENTATIONS, OMISSIONS, AND REGULATORY VIOLATIONS

### A.   Failure to Disclose Material Risks and Regulatory Evasion

107.   Plaintiff realleges and incorporates by reference all preceding paragraphs of the Complaint as though fully set forth herein.

108.   At all relevant times, Defendant Boston Scientific Corporation engaged in a course of conduct designed to conceal material risks associated with its spinal cord stimulator systems, misrepresent the safety and efficacy of its devices, and improperly utilize the PMA supplement process to introduce significant, unvalidated design changes without triggering mandatory premarket review.

109.   Boston Scientific represented to Plaintiff, her healthcare providers, and the medical community that its Spectra WaveWriter system and related devices were safe, effective, supported by clinical data, and appropriately approved for long-term implantation.

110.   These representations were false, misleading, and incomplete. Boston Scientific knew, or should have known through post-market surveillance and regulatory obligations, that the Spectra Wavesystem:

- Was not supported by clinical data;
- Posed an increased risk of device migration, stimulation failure, and neurological injury;
- Was marketed with stimulation modalities not adequately tested in clinical trials;

- Carried a known risk of autonomic dysfunction, including incontinence, hypotension, and cardiac arrhythmia;

- Had materially different performance characteristics from the external trial device, upon which ultimate treatment predictions and decisions were made.

111.   Boston Scientific actively concealed the information by:

- Failing to conduct clinical trials and submit meaningful clinical data to the FDA as required by 21 U.S.C. § 360e(d) and 21 CFR § 814.20.

- Failing to report adverse events under 21 C.F.R. § 803.50;

- Withholding labeling updates and field safety communications under 21 C.F.R. § 814.39(d);

- Submitting fragmented PMA supplements to avoid full panel-track review required by 21 C.F.R. § 814.39(a).

112.   These actions violated non-discretionary regulatory obligations and rendered the device unsafe for its intended use and deprived physicians and patients of information required for informed medical decision-making.

**B.     Violations of Current Good Manufacturing Practices (cGMPs)**

113.   In addition to the above, Boston Scientific violated multiple cGMP requirements codified at 21 C.F.R. Part 820 — including those governing design control, process validation, complaint handling, and corrective and preventive action (CAPA).

114.   Specifically, Boston Scientific:

- Failed to maintain adequate design validation under 21 C.F.R. § 820.30(g), particularly in light of the software and waveform changes introduced with the Precision Spectra system;

- Failed to validate and monitor manufacturing processes as required under 21 C.F.R. § 820.75, leading to inconsistencies in lead bonding and IPG housing integrity;

- Failed to investigate and correct known device performance issues through its CAPA system, in violation of 21 C.F.R. § 820.100;

- Failed to evaluate post-market complaints systematically and incorporate them into product redesign and labeling revisions, in violation of 21 C.F.R. § 820.198.

115.    These cGMP violations are not discretionary; they are binding legal obligations imposed by the FDA to ensure the safety and effectiveness of devices. They establish minimum standards for medical device manufacturers and are incorporated by reference into Texas tort law as parallel duties.

116.    Boston Scientific's violation of these cGMP requirements caused Plaintiffs' injuries described herein. It was reasonably foreseeable that these violations would cause injury to Plaintiff and others. Specifically, these violations resulted in an unsafe product being marketed to Plaintiff and deprived Plaintiff and her physicians of important information about the safety and efficacy of the device at issue.

117.    Boston Scientific's repeated and willful violations of cGMP requirements caused or substantially contributed to the defects and injuries at issue in the case, and support Plaintiff's claims under Texas law.

118.    These claims are not preempted under *Riegel* or *Buckman* because they are premised on state-law duties that genuinely parallel federal requirements and do not exist solely by virtue of the FDCA.

## VII.   CAUSES OF ACTION

### COUNT I – MANUFACTURING DEFECT
*Against Defendant Boston Scientific and Boston Scientific Neuromodulation*

(Texas Common Law; 21 U.S.C. § 360k(a); 21 C.F.R. §§ 820.30, 820.70, 820.75, 820.100)

119.   Plaintiff realleges and incorporates by reference all preceding paragraphs of the Complaint as though fully set forth herein.

120.   At all relevant times, Defendant Boston Scientific Corporation and Boston Scientific Neuromodulation were engaged in the design, manufacture, labeling, marketing, and distribution of spinal cord stimulator systems throughout the United States, including the Spectra WaveWriter system implanted in Plaintiff.

121.   Under Texas law, a manufacturing defect occurs when, "the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product." *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 42 (Tex. 2007). Further, a specific defect must be identified, and other possible causes must be ruled out. *Id.*

122.   The spinal cord stimulator system implanted in Plaintiff was not reasonably safe as manufactured. It deviated materially from its intended design specifications and from applicable federal requirements governing Class III medical devices.

123.   Defendant Boston Scientific violated non-discretionary federal manufacturing and quality system regulations, including but not limited to:

- 21 C.F.R. § 820.30: failure to implement adequate design controls;
- 21 C.F.R. § 820.70: failure to establish process controls ensuring conformity to design specifications;
- 21 C.F.R. § 820.75: failure to validate manufacturing processes capable of consistently producing conforming devices;

- 21 C.F.R. § 820.100: failure to implement corrective and preventive action in response to known device defects.

124. The Spectra WaveWriter system implanted in Plaintiff was manufactured with latent defects affecting performance, stability, and safety, including but not limited to:

- Defects impacting the physical stability of the battery in the bodies of patients;

- Battery instability contributing to irregular stimulation output and early depletion, including need for battery replacement;

- Faulty firmware or programming inconsistencies affecting waveform delivery, and causing complications in patients, including shocking and unsatisfactory pain relief.

125. These defects were not detectable by Plaintiff or her physicians through reasonable inspection prior to implantation and were not reasonably foreseeable based on the information available to Plaintiff or her treating physicians at the time.

126. These defects were present at the time that the SCS system left Boston Scientific's control.

127. The Spectra WaveWriter deviated from the specifications that the FDA approved in PMA P030017.

128. As a direct and proximate result of the manufacturing defects described herein, Plaintiff suffered the injuries, damages, and losses set forth above, including physical pain and suffering, emotional distress, medical expenses, permanent injury, additional surgical intervention, and diminished enjoyment of life.

129. Plaintiff's manufacturing defect claim arises under state-law duties that parallel federal manufacturing obligations imposed on Boston Scientific. These

claims are not expressly or impliedly preempted under 21 U.S.C. § 360k(a), *Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008), or *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001).

**WHEREFORE**, Plaintiff demands judgment against Defendant Boston Scientific Corporation and Boston Scientific Neuromodulation for compensatory damages, attorneys' fees where permitted, costs of suit, pre- and post-judgment interest, and such other and further relief as the Court deems just and proper.

<u>**COUNT II – FAILURE TO WARN**</u>
***Against Defendant Boston Scientific and Boston Scientific Neuromodulation***
(Texas Common Law; 21 C.F.R. §§ 803.50, 814.39, 820.198)

130.    Plaintiff realleges and incorporates by reference all preceding paragraphs of the Complaint as though fully set forth herein.

131.    At all relevant times, Defendant Boston Scientific Corporation and Boston Scientific Neuromodulation were engaged in the design, manufacture, labeling, marketing, and distribution of spinal cord stimulator systems throughout the United States, including the Spectra WaveWriter system implanted in Plaintiff.

132.    Under Texas law, a product may be defective and unreasonably dangerous *due to the **failure to warn*** of the dangers involved in using it only if the dangers were foreseeable to the manufacturer at the time it marketed the product. *USX Corp. v. Salinas*, 818 S.W.2d 473, 485 (Tex. App.—San Antonio 1991, writ denied).

133.    Boston Scientific had a duty to warn Plaintiff, her healthcare providers, and the medical community of the material risks associated with its spinal cord stimulator systems, including but not limited to:

- The risk of lead and generator migration and device failure requiring surgical revision;
- The risk that the trial device would not reliably predict the performance of the permanently implanted device;

- The risk of device-related pain exacerbation , nerve damage, and loss of therapeutic efficacy over time.

134. Boston Scientific breached its duty to warn by:

- Failing to update product labeling and Instructions for Use (IFU) to reflect emerging adverse event trends in the nearly twenty years since PMA P030017 was initially approved;

- Failing to disseminate "Dear Doctor" letters or field advisories warning of known failure modes that arose since PMA P030017 was approved;

- Failing to adequately train sales representatives and clinicians regarding the safety and efficacy limitations of multiwaveform stimulation, and the Spectra WaveWriter system generally;

- Actively promoting the Spectra WaveWriter system as superior, effective, and safe without disclosing material limitations and risks;

- Actively promoting the permanent Spectra WaveWriter as superior or equivalent in efficacy to temporary trial SCS.

135. These failures were compounded by violations of federal law, including:

- 21 C.F.R. § 803.50: failure to timely report adverse events;

- 21 C.F.R. § 814.39: failure to submit PMA supplements for significant changes;

- 21 C.F.R. § 820.198: failure to investigate and address post-market complaints.

136. Plaintiff and her physicians justifiably relied on Defendant's representations and omissions.

137. Had appropriate warnings, like adverse events on the MAUDE database, been provided, Plaintiff would not have consented to implantation.

138.   As a direct and proximate result, Plaintiff suffered injuries including physical pain, emotional distress, surgical revision, and economic loss.

139.   These claims are not preempted because they are based on parallel state-law duties that mirror federal requirements.

**WHEREFORE**, Plaintiff demands judgment against Defendant Boston Scientific Corporation **and Boston Scientific Neuromodulation** for compensatory damages, attorneys' fees where permitted, costs of suit, interest, and all such further relief as the Court deems just and proper.

### COUNT III – NEGLIGENCE PER SE AND BREACH OF FEDERAL REGULATORY DUTIES
*Against Defendant Boston Scientific and Boston Scientific Neuromodulation*

(Texas Common Law; 21 C.F.R. §§ 820.30(g), 820.75, 820.100, 820.198)

140.   Plaintiff realleges and incorporates by reference all preceding paragraphs of the Complaint as though fully set forth herein.

141.   At all relevant times, Defendant Boston Scientific Corporation and Boston Scientific Neuromodulation owed duties to Plaintiff, her healthcare providers, and the public to comply with federal medical device regulations and to manufacture, monitor, and report on its spinal cord stimulator systems in accordance with Current Good Manufacturing Practices ("cGMPs") set forth in 21 C.F.R. Part 820.

142.   These cGMP requirements are not discretionary. They impose binding legal obligations to implement and maintain design controls, process validation, complaint handling systems, and corrective and preventive actions for Class III medical devices.

143.   Defendant breached these duties by failing to:

- Timely submit adverse event reports under 21 C.F.R. § 803.50;
- Implement effective design validation under 21 C.F.R. § 820.30(g);

- Validate and monitor production processes under 21 C.F.R. § 820.75;

- Respond adequately to known product failures through its Corrective and Preventive Action (CAPA) system in violation of 21 C.F.R. § 820.100;

- Investigate and act upon post-market complaints in accordance with 21 C.F.R. § 820.198.

144.   These regulatory breaches materially contributed to the manufacture, release, and continued distribution of unsafe, unvalidated, and defectively designed spinal cord stimulator systems that failed during normal use, including the Spectra WaveWriter system implanted in Plaintiff.

145.   These regulatory breaches also made it impossible for Boston Scientific to reasonably inform physicians and patients regarding the true efficacy and safety profile of its Spectra WaveWriter system, including the true risks of the system, which would have been known to Boston Scientific if it had satisfied its federal duties to investigate and report adverse events to the FDA.

146.   Texas law permits suits for negligence per se if the plaintiff belongs to the class of persons the statute was intended to protect, and the plaintiff's injuries were of the type the statute was designed to prevent.

147.   Plaintiff was a member of the class of individuals that the regulations set forth above were intended to protect.

148.   The harms suffered by Plaintiff, including physical pain, are the type that the regulations set forth above is intended to prevent.

149.    Boston Scientific breached its duty to Plaintiff by violating mandatory federal regulations.

150.   The Texas Supreme Court has established factors to determine whether negligence per se is appropriate.

151. Whether the statute is the sole source of any tort duty or merely supplies a standard of conduct for an existing common law duty.

152. Whether the statute clearly defines the required conduct, thereby putting the public on notice.

153. Whether the statute would impose liability without fault.

154. Whether negligence per se would result in disproportionate or ruinous damages relative to the seriousness of the statutory violation.

155. Whether the plaintiff's injury is a direct or indirect result of the statutory violation.

> *Metzloff v. Royal Trucking Co.*, 473 F. Supp. 3d 707-708 (E.D. Tex. 2020).

156. 21 C.F.R. §§ 820.30(g), 820.75, 820.100, and 820.198 is the sole source of Boston Scientific's duty to adhere to federal quality standards.

157. These federal regulations clearly define the conduct required by each manufacturer.

158. These regulations impose liability without fault.

159. A finding of negligence per se would not result in disproportionate or ruinous damages relative to the seriousness of the statutory violation.

160. Plaintiff suffered her injuries as a direct result of Boston Scientific violating these federal regulations because if Boston Scientific had fulfilled its federal regulatory duties, the Spectra WaveWriter system would not have been on the market when it was implanted in Plaintiff's body.

161. In fact, If Boston Scientific had fulfilled its federal regulatory duties, including its duty to investigate and report adverse events, Plaintiff would not have agreed to the permanent implantation of the Spectra WaveWriter system in her body.

162. Violating these federal regulations was inherently unreasonable, and therefore, Boston Scientific acted unreasonable and breached its duty to Plaintiff.

163.   As a direct and proximate result of Defendant's breach of its duty to Plaintiff, Plaintiff suffered physical injuries, including permanent injuries, emotional distress, medical costs, diminished enjoyment of life, and other compensable harms.

164.   These claims arise under state-law duties that genuinely parallel federal obligations imposed by the FDCA and are not expressly or impliedly preempted under *Riegel*, *Buckman*, or 21 U.S.C. § 360k(a).

**WHEREFORE**, Plaintiff demands judgment against Defendant Boston Scientific Corporation and Boston Scientific Neuromodulation for compensatory damages, attorneys' fees where permitted, costs of suit, pre- and post-judgment interest, and such other and further relief as the Court deems just and proper.

## COUNT IV – BREACH OF EXPRESS WARRANTY
### *Against Defendant Boston Scientific and Boston Scientific Neuromodulation*
(Tex. Bus. & Com. Code § 2.313)

165.   Plaintiff realleges and incorporates by reference all preceding paragraphs of the Complaint as though fully set forth herein.

166.   At all relevant times, Defendant Boston Scientific Corporation and Boston Scientific Neuromodulation expressly warranted, through its labeling, advertising, marketing materials, website representations, sales representatives, and field support personnel, that its spinal cord stimulator systems, including the Spectra WaveWriter system, were safe, effective, durable, supported by clinical data, and fit for the treatment of chronic pain conditions.

167.   Due to the extensive direct communications between Boston Scientific personnel and Plaintiff, privity of contract existed between these two parties.

168.   These express warranties included, but were not limited to, assurances that:

- The safety and effectiveness of the Spectra WaveWriter was validated by clinical data or clinical evidence;

- The permanent Spectra WaveWriter system would provide greater or equivalent pain relief compared to the temporary trial SCS;

- The Spectra WaveWriter system's multiwaveform stimulation technology provided superior pain relief without significant risk of adverse side effects;

- The device was durable and appropriately designed for long-term implantation and therapeutic use without significant risks of lead or generator migration, neurological injury, battery failure, rapidly declining efficacy, or stimulation-induced autonomic dysfunction;

- The system had been adequately tested for safety and effectiveness consistent with FDA requirements.

169.   Such express warranties were made to Plaintiff's healthcare providers and directly to Plaintiff through Boston Scientific's promotional materials and field representatives.

170.   Plaintiff and her healthcare providers reasonably relied on these express warranties in choosing to proceed with implantation of the Spectra WaveWriter system and in making ongoing treatment decisions.

171.   Contrary to these express warranties, the Spectra WaveWriter system implanted in Plaintiff was defective, unreasonably dangerous, and incapable of delivering the promised therapeutic benefits. It was also not validated by clinical data, as represented to Plaintiff and her physicians. Instead, it caused Plaintiff to suffer injuries including persistent ineffective pain relief, nerve damage, stimulation-related complications, infection, IPG migration that broke through her skin, and ultimately, significant physical and emotional harm.

172.   Defendant's conduct described herein breached its express warranties under Texas law.

Case 2:26-cv-02789   Document 1   Filed 03/16/26   Page 32 of 49   Page ID #:32

173. Under Texas law, a manufacturer may be liable for breach of warranty if a product fails to perform as expressly warranted and causes harm.

174. Defendant's breaches of express warranty were a direct and proximate cause of Plaintiff's injuries, including physical pain, mental anguish, loss of enjoyment of life, additional medical expenses, and financial loss.

175. Plaintiff's claims for breach of express warranty are based on independent state-law duties and contractual obligations and are not expressly or impliedly preempted under federal law.

WHEREFORE, Plaintiff demands judgment against Defendant Boston Scientific Corporation and Boston Scientific Neuromodulation for compensatory damages, consequential and incidental damages, punitive damages where permitted, attorneys' fees where allowed, costs of suit, pre- and post-judgment interest, and such other and further relief as the Court deems just and proper.

**COUNT V – BREACH OF IMPLIED WARRANTIES**
*Against Defendant Boston Scientific and Boston Scientific Neuromodulation*

(Tex. Bus. & Com. Code § 2.314 and 2.315)

176. Plaintiff realleges and incorporates by reference all preceding paragraphs of the Complaint as though fully set forth herein.

177. Defendant Boston Scientific and Boston Scientific Neuromodulation knew of the use that the Spectra WaveWriter system was intended for and impliedly warranted to Plaintiff and her healthcare providers that the system was of merchantable quality and safe for the use for which it was intended, specifically the permanent implantation into human beings for the purpose of treating and relieving chronic pain.

178. Boston Scientific knew that, by holding the Spectra WaveWriter system out as being approved by the FDA under the Premarket Approval process, physicians and patients would understand that the quality of the system was of a degree that was supported by clinical data and evidence of safety and effectiveness.

Thus, Boston Scientific impliedly warranted to Plaintiff and her physicians that the system was supported by such evidence.

179.    Plaintiff and her healthcare providers reasonably relied on these implied warranties in choosing to proceed with implantation of the Spectra WaveWriter system and in making ongoing treatment decisions.

180.    Contrary to these implied warranties, the Spectra WaveWriter system was not of merchantable quality, safe for its intended use, or supported by clinical data or evidence of safety and effectiveness.

181.    Defendant's breaches of implied warranties were a direct and proximate cause of Plaintiff's injuries, including physical pain, mental anguish, loss of enjoyment of life, additional medical expenses, and financial loss.

182.    Plaintiff's claims for breach of implied warranties are based on independent state-law duties and contractual obligations and are not expressly or impliedly preempted under federal law.

WHEREFORE, Plaintiff demands judgment against Defendant Boston Scientific Corporation and Boston Scientific Neuromodulation for compensatory damages, consequential and incidental damages, punitive damages where permitted, attorneys' fees where allowed, costs of suit, pre- and post-judgment interest, and such other and further relief as the Court deems just and proper.

**COUNT VI – FRAUDULENT MISREPRESENTATION**
***Against Defendant Boston Scientific and Boston Scientific Neuromodulation***

(Texas Common law)

183.    Plaintiff realleges and incorporates by reference all preceding paragraphs of the Complaint as though fully set forth herein.

184.    At all relevant times, Defendant Boston Scientific Corporation and Boston Scientific Neuromodulation, acting individually and through its agents, employees, and representatives, made material misrepresentations and omissions of

fact regarding the safety, efficacy, and regulatory compliance of its spinal cord stimulator systems, including the Spectra WaveWriter system implanted in Plaintiff.

185.   Defendant communicated directly with Plaintiff and her physicians through sales representatives.

186.   Defendant represented to Plaintiff, her healthcare providers, and the general public, through marketing materials, sales presentations, Instructions for Use (IFU), direct to patient communications, and other communications, that:

- The Spectra WaveWriter system was supported by clinical data and evidence of safety and effectiveness, as required for Premarket Approval, and was approved for sale based on such clinical data and evidence;
- The Spectra WaveWriter system was safe and effective for the long-term management of chronic pain;
- The permanent Spectra WaveWriter system would provide greater or equivalent pain relief compared to the temporary SCS trial;
- The device's multiwaveform stimulation capabilities and other "new" device features reduced the risk of therapy failure and side effects compared to older systems;
- The device had been adequately validated and reviewed consistent with FDA requirements for significant design and functionality changes.

187.   These material representations were false. Defendant knew or should have known, through reasonable investigation, post-market surveillance, and adverse event reporting, that:

- The Spectra WaveWriter system was not supported by clinical data or evidence of safety and effectiveness, as required for Premarket

Approval, nor was it approved for sale based on such clinical data or evidence;

- The Spectra WaveWriter system was associated with a materially increased risk of lead migration, therapy abandonment, stimulation-induced autonomic dysfunction, device-related complications, and rapid decrease in efficacy over time;

- The device's multiwaveform stimulation capabilities and other "new" device features did not reduce the risk of therapy failure and side effects compared to older systems;

- The permanent device materially differed in performance and risk profile from the external trial device;

- Boston Scientific had not submitted adequate clinical evidence to substantiate the safety and effectiveness of its multiwaveform and posture-adaptive programming technologies;

- Boston Scientific's devices were being improperly marketed under serial PMA supplements rather than undergoing new PMA review as required by law.

188. Defendant made these material misrepresentations and omissions intentionally, willfully, recklessly, and with the intent to induce healthcare providers to recommend, and patients to consent to, implantation of its devices.

189. Plaintiff's healthcare providers justifiably relied on Boston Scientific's representations in recommending the Spectra WaveWriter system, and Plaintiff justifiably relied on the same representations in consenting to implantation and subsequent medical decisions.

190. Boston Scientific's field representatives directly interacted with Plaintiff and Plaintiff's care team and participated in programming the device. Their conduct reinforced the impression that the system was safe and effective and

that post-implantation adjustments would resolve complications. These communications omitted material facts and conveyed false assurances, including before the implantation and for years after the implantation.

191.   Plaintiff had no reasonable means of independently discovering the falsity of Defendant's statements at the time of implantation, as Boston Scientific had superior knowledge of the device's design changes, clinical performance, and regulatory history, and actively concealed adverse information from physicians, patients, and regulators.

192.   Plaintiff also had no reasonable means of independently discovering the falsity of Defendant's statements following implantation, as Boston Scientific had superior knowledge of the device's design changes, clinical performance, and regulatory history, and actively concealed adverse information from physicians, patients, and regulators.

193.   Defendant's misrepresentations, including those made by sales representatives, before the implantation procedure caused Plaintiff to consent to the implantation of the SCS system.

194.   Defendant, through its representatives, also made misrepresentations to Plaintiff about complications and inadequate pain relief she experienced after the permanent implant, representing to her that multiple reprogrammings would alleviate her complications and increase her pain relief. These representations were made at the time of the reprogrammings.

195.   Defendant knew these post-implant representations to be false.

196.   Plaintiff discovered the probable causal relationship between her injuries and Defendant's conduct only after experiencing continued device-related complications and reviewing public disclosures, adverse event reports, and litigation materials that contradicted Defendant's original representations.

197.   As a direct and proximate result of Defendant's fraudulent misrepresentations and omissions, Plaintiff suffered significant injuries, including

physical pain, emotional distress, medical expenses, diminished quality of life, and other consequential damages.

198. Plaintiff's fraud claims arise under Texas common law, and are not based solely on FDCA violations, but rather Defendant's intentional misstatements and concealments made to induce reliance by Plaintiff and her physicians.

**WHEREFORE,** Plaintiff demands judgment against Defendant Boston Scientific Corporation and **Boston Scientific Neuromodulation** for compensatory damages, punitive damages where permitted, attorneys' fees where allowed, costs of suit, pre- and post-judgment interest, and such other and further relief as the Court deems just and proper.

## COUNT VII – NEGLIGENT MISREPRESENTATION
### *Against Defendant Boston Scientific and Boston Scientific Neuromodulation*

(Texas Common Law)

199. Plaintiff realleges and incorporates by reference all preceding paragraphs of the Complaint as though fully set forth herein.

200. At all relevant times, Defendant Boston Scientific Corporation and Boston Scientific Neuromodulation, acting individually and through its agents, employees, and representatives, owed a duty to exercise reasonable care in communicating truthful, accurate, and complete information about its spinal cord stimulator systems, including the Spectra WaveWriter system.

201. Defendant supplied false information in its promotional materials, sales presentations, Instructions for Use (IFU), labeling, and direct communications to healthcare providers and patients regarding the safety, efficacy, design features, and regulatory status of the Spectra WaveWriter system.

202. Specifically, Defendant negligently misrepresented that:

- The safety and efficacy of the Spectra WaveWriter system was validated by clinical data, as required for Premarket Approval, and was approved for sale based on such clinical data;

- The Spectra WaveWriter system was safe and effective for the long-term treatment of chronic pain;

- The system's multiwaveform stimulation and other "new" device features would enhance therapeutic outcomes and reduce adverse effects compared to previous devices;

- The permanent Spectra WaveWriter system would provide greater pain relief than the temporary SCS trial;

- The system had been appropriately validated through regulatory submissions consistent with FDA standards for safety and effectiveness.

203.    Defendant made these representations without reasonable grounds for believing them to be true. A reasonable manufacturer exercising appropriate care would have known that:

- The Spectra WaveWriter system was not supported by clinical data or evidence of safety and effectiveness, as required for Premarket Approval, nor was it approved for sale based on such clinical data or evidence;

- The Spectra WaveWriter system was associated with a materially increased risk of lead migration, therapy abandonment, stimulation-induced autonomic dysfunction, and device-related complications;;

- The permanent implant differed materially in performance from the external trial device;

- The modified stimulation technologies, battery architecture, and other "new" features introduced new and significant risks not present in predicate devices;

- The device's multiwaveform stimulation capabilities and other "new" device features did not reduce the risk of therapy failure and side effects compared to older systems;

- Clinical data validating the long-term safety and efficacy of the device modifications were lacking or insufficient;

- Adverse event trends, including stimulation-related autonomic dysfunction, required disclosure to regulators and treating physicians.

204. Plaintiff's healthcare providers reasonably relied on Defendant's representations in recommending implantation of the Spectra WaveWriter system, and Plaintiff reasonably relied on the same representations in consenting to implantation.

205. Had Plaintiff and her healthcare providers been accurately and fully informed of the true risks and limitations associated with the device, they would not have elected to proceed with implantation or would have pursued alternative treatment options.

206. Defendant, through its representatives, also made misrepresentations to Plaintiff about complications and inadequate pain relief he experienced after the permanent implant, representing to her that multiple reprogrammings would alleviate her complications and increase her pain relief. These representations were made at the time of the reprogrammings.

207. Defendant knew or should have known that these post-implant representations were false.

208. Plaintiff relied on these representations in electing not to have the system removed, causing her additional and continued injuries.

209.    As a direct and proximate result of Defendant's negligent misrepresentations, Plaintiff suffered physical injuries, emotional distress, additional medical expenses, financial losses, and diminished quality of life.

210.    Plaintiff's negligent misrepresentation claims arise under state common law, including Texas Common Law. These claims are not premised solely on FDCA enforcement and are not preempted under *Buckman* or *Riegel*.

**WHEREFORE**, Plaintiff demands judgment against Defendant Boston Scientific Corporation and Boston Scientific Neuromodulation for compensatory damages, attorneys' fees where permitted, costs of suit, pre- and post-judgment interest, and such other and further relief as the Court deems just and proper.

## COUNT VIII – VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES CONSUMER PROTECTION ACT (DTPA)
### *Against Defendant Boston Scientific and Boston Scientific Neuromodulation*
(Tex. Bus. & Com. Code § 17.41)

211.    Plaintiff realleges and incorporates by reference all preceding paragraphs of the Complaint as though fully set forth herein.

212.    At all relevant times, Defendant Boston Scientific Corporation and Boston Scientific Neuromodulation were engaged in trade and commerce as defined by the Texas Deceptive Trade Practices-Consumer Protection Act (DTPA), including the nationwide marketing, sale, and distribution of spinal cord stimulator systems such as the Spectra WaveWriter system.

213.    The DTPA prohibits a wide range of false, misleading, or deceptive acts or practices in the conduct of trade or commerce. This includes, but is not limited to:

214.    Causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

215.    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have;

216. Advertising goods or services with intent not to sell them as advertised; and

217. Any act that takes advantage of a consumer's lack of knowledge, ability, experience, or capacity to a grossly unfair degree.

Tex. Bus. & Com. Code § 17.45 and 17.46

218. Defendant Boston Scientific engaged in unlawful and deceptive conduct, directly to Plaintiff through its representatives before Plaintiff elected to have the Spectra WaveWriter system permanently implanted in her body, including but not limited to:

- Misrepresenting the clinical support for the safety and efficacy of the Spectra WaveWriter system;

- Misrepresenting the safety, reliability, and long-term performance of the Spectra WaveWriter system;

- Failing to disclose known risks of stimulation-induced autonomic dysfunction, device migration, and therapy failure;

- Marketing the external trial device as predictive of permanent implant outcomes despite internal knowledge to the contrary;

- Omitting material information regarding post-market failures, cGMP violations, and adverse events from its product labeling and promotional materials.

219. These acts and omissions were directed at Plaintiff, her healthcare providers, and the general public, and were intended to and likely to deceive reasonable consumers and physicians.

220. The methods, acts, and practices employed by Boston Scientific as described herein would cause a reasonable person to enter into the transaction because they are taking advantage of a lack of knowledge, ability, experience, or capacity to a grossly unfair degree.

221. As a result of Defendant's conduct, Plaintiff has suffered ascertainable loss that can be calculated with a reasonable degree of certainty, including physical injury and economic loss.

222. Plaintiff and her healthcare providers reasonably relied on Boston Scientific's misrepresentations and omissions in consenting to the device's implantation and continuing therapy.

223. Defendant's conduct was willful and knowing. Plaintiff seeks actual damages, restitution, injunctive relief, and statutory damages under the MPA.

224. As a direct and proximate result, Plaintiff suffered injury in fact and economic damages, including unnecessary medical expenses, physical pain, emotional distress, and loss of quality of life.

**WHEREFORE**, Plaintiff demands judgment against Defendant Boston Scientific Corporation and Boston Scientific Neuromodulation for actual damages, treble and statutory damages, punitive damages, restitution, attorneys' fees and costs, injunctive relief, and such further relief as the Court deems just and proper.

## COUNT IX – NEGLIGENCE PER SE FOR PRACTICING MEDICINE WITHOUT A LICENSE
*Against Defendant Boston Scientific and Boston Scientific Neuromodulation*

(Tex. Occ. Code § 165.153)

225. Plaintiff realleges and incorporates by reference all preceding paragraphs of the Complaint as though fully set forth herein.

226. At all relevant times, Boston Scientific Corporation and Boston Scientific Neuromodulation employed and deployed sales and clinical field representatives to assist in the surgical implantation and post-operative programming of its spinal cord stimulator systems, including the Spectra WaveWriter system implanted in Plaintiff.

227. These field representatives, none of whom were licensed healthcare professionals in the State of Texas, routinely and in Plaintiff's case:

- Entered surgical suites during spinal cord stimulator implantation procedures;

- Advised surgeons and operating room staff on intraoperative lead positioning and stimulation testing;

- Participated in real-time programming of the device based on patient response during surgery;

- Provided device setting recommendations to healthcare providers during post-operative care;

- Adjusted or instructed adjustment of device parameters that materially influenced treatment decisions;

- Directly advised patients, including Plaintiff, about the safety and efficacy of the SCS system, benefits of the system, and impacts of reprogramming the SCS system;

- Provided medical advice to patients, including Plaintiff, regarding the SCS system, symptoms now alleged to be caused by the SCS system, and decisions related to the SCS system.

228. These activities constitute the unlicensed practice of medicine in violation Texas law, which prohibit any person from diagnosing, treating, or recommending treatment for human ailments without a valid medical license.

229. Texas law permits statutes to serve as evidence of reasonableness, and therefore, violation of statute to serve as evidence of a breach of the duty to act reasonably toward others.

230. Plaintiff was a member of the class of individuals that Tex. Occ. Code § 165.153 was intended to protect.

231. The harms suffered by Plaintiff, including physical pain, are the type that Tex. Occ. Code § 165.153 is intended to prevent.

232. As a direct and proximate result of Defendant's statutory violations and its failure to adequately train, supervise, or restrict the conduct of its representatives, Plaintiff suffered harm, including but not limited to: improper lead placement, ineffective stimulation, neurological injury, permanent nerve damage, device-related complications, additional surgeries, and prolonged pain and suffering.

233. Defendant's conduct constitutes negligence per se under Texas law and entitles Plaintiff to compensatory and punitive damages.

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered against Defendant Boston Scientific Corporation and Boston Scientific Neuromodulation for compensatory and punitive damages, attorneys' fees where permitted, costs of suit, and all other relief the Court deems just and proper.

## COUNT X – NEGLIGENCE

### *Against Defendant Boston Scientific and Boston Scientific Neuromodulation*

(Texas Common law)

234. Plaintiff realleges and incorporates by reference all preceding paragraphs of the Complaint as though fully set forth herein.

235. Defendant Boston Scientific and Boston Scientific Neuromodulation are vicariously liable under Texas law for all actions of its representatives taken in the course and scope of their employment with Boston Scientific.

236. Boston Scientific representatives that interacted with Plaintiff owed a duty of care to Plaintiff, including the duty to act reasonably and prudently toward Plaintiff so as not to cause her harm.

237. These representatives breached the duty of care by providing inaccurate and misguided medical advice regarding the Boston Scientific SCS system and complications Plaintiff experienced after being implanted with the system.

238.   These representatives breached their duty of care by reprogramming Plaintiff's SCS system without sufficient knowledge, skill, and expertise to do so, and by continuing to reprogram the system after it should have been clear to them that the reprogramming was futile.

239.   The breach of duty of these representatives proximately caused injury to Plaintiff, both because it proximately caused her to agree to be implanted with the device and because it proximately caused her to elect to keep the device implanted in her body and undergo multiple reprogrammings, all while experiencing complications and poor pain relief.

240.   The negligence of these representatives was willful and wanton, evidencing a conscious disregard for the rights of others and a desire to seek profits over patient safety. Therefore, punitive damages are appropriate.

241.   Defendant Boston Scientific had a duty to reasonably and prudently hire, train, and supervise its employees, including the representatives that interacted with Plaintiff.

242.   Defendant Boston Scientific breached its duty to reasonably and prudently hire, train, and supervise these employees.

243.   If Defendant Boston Scientific had reasonably and prudently hired, trained, and supervised these employees, the representatives conduct described above would not have occurred and Plaintiff would not have been injured as a proximate result.

244.   Therefore, Defendant Boston Scientific's failure to reasonably and prudently hire, train, and supervise these employees proximately caused Plaintiff's injuries.

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered against Defendant Boston Scientific Corporation and Boston Scientific Neuromodulation for compensatory and punitive damages, attorneys' fees were permitted, costs of suit, and all other relief the Court deems just and proper.

- 45 -

## COUNT XI – ADMINISTRATIVE PROCEDURE ACT (APA) – DECLARATORY AND INJUNCTIVE RELIEF AGAINST THE FDA

### *Against Defendant U.S. Food and Drug Administration*

(5 U.S.C. §§ 701–706; *Loper Bright Enterprises v. Raimondo*,

603 U.S. 369 (2024))

245.    Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

246.    This cause of action is brought against Defendant United States Food and Drug Administration solely in its official capacity under the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

247.    The APA authorizes judicial review of final agency action, including agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. See 5 U.S.C. §§ 706(1), 706(2)(A)–(D); *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).

248.    The FDA's passive acceptance and approval of original PMA applications and subsequent supplements submitted by Defendant Boston Scientific Corporation for its Precision Spectra spinal cord stimulator system constituted final agency action within the meaning of the APA.

249.    The FDA acted arbitrarily and capriciously, and contrary to law, by:

- Approving PMA P030017 despite Boston Scientific's failure to supply data required by 21 CFR §814.20, and instead granting approval based on "available peer reviewed published literature for similar implantable spinal cord stimulation (SCS) systems."

- Approving substantial modifications to the original device — including the addition of multiwaveform stimulation, posture-adaptive programming, and battery redesign — without requiring new PMA applications or adequate independent clinical validation;

- Failing to adequately scrutinize Boston Scientific's original PMA P030017 and subsequent PMA supplements that materially altered the device's design, safety profile, and intended use;

- Permitting Boston Scientific to evade full panel-track PMA review through incremental supplement filings, despite knowing or having reason to know that the cumulative changes were substantial;

- Failing to mandate labeling updates or field safety communications in response to known adverse event trends related to stimulation-induced autonomic dysfunction, device migration, and therapy failure;

- Disregarding its statutory duty under 21 U.S.C. § 360e(d) to ensure that significant changes to Class III devices receive the same rigorous review as original PMA applications.

250.    The FDA's actions and omissions enabled Boston Scientific to market a materially altered, insufficiently validated, and defectively designed spinal cord stimulator system to Plaintiff and similarly situated patients without the protections mandated by Congress for high-risk medical device.

251.    The FDA's actions and omissions allowed Boston Scientific to market its SCS systems, including the Precision Spectra system, as Class III devices without subjecting these devices to the statutorily and regulatorily required review.

252.    The FDA's misconduct is further evidenced by its historical pattern of regulatory capture concerning spinal cord stimulators, including its decision to override an advisory panel recommendation in 2003 that implantable SCS devices be reclassified from Class III to Class II, without requiring manufacturers to complete PMA obligations thereafter. See FDA Docket No. 02P-0321.[2]

---

[2] In 2001, Advanced Neuromodulation Systems (ANS) petitioned the FDA to reclassify implantable spinal cord stimulators from Class III to Class II. An FDA advisory panel recommended reclassification; however, the FDA headquarters overruled the panel and maintained Class III status without instituting corresponding PMA enforcement or strengthening requirements thereafter. *See* Docket No. 02P-0321 (FDA)

- 47 -

253. Plaintiff suffered direct injury as a result of the FDA's arbitrary and unlawful agency actions. But for the FDA's approval of Boston Scientific's cumulative PMA supplement submissions without adequate scrutiny, Plaintiff would not have been implanted with the defective device that caused his injuries.

254. Plaintiff also suffered direct legal injury as a result of the FDA's arbitration and unlawful agency actions. But for the FDA's actions and omissions, Boston Scientific would not have received PMA approval for the SCS system implanted in Plaintiff, and therefore, would not be able to invoke federal preemption to shield itself from liability for the physical injuries that the SCS system caused Plaintiff.

255. The legal injury experienced by Plaintiff was a foreseeable result of the FDA's actions.

256. Plaintiff seeks declaratory relief declaring that the FDA's actions regarding the PMA supplements for Boston Scientific's spinal cord stimulator systems were arbitrary, capricious, an abuse of discretion, and contrary to law.

257. Plaintiff further seeks injunctive relief requiring the FDA to reconsider and, if necessary, rescind or suspend the PMA approvals granted for materially altered spinal cord stimulator systems that failed to undergo appropriate panel-track or original PMA review.

258. Plaintiff's claims under the APA are properly brought under 5 U.S.C. § 702 and 5 U.S.C. § 706, and are not precluded by any statutory or regulatory exemption from judicial review.

**WHEREFORE**, Plaintiff demands declaratory judgment against Defendant United States Food and Drug Administration, injunctive relief as permitted under the APA, costs of suit, reasonable attorneys' fees where permitted, and such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

**THE CARLSON LAW FIRM, PC**

Adam M. Evans (MO# 60895)
Elijah Biedinger (TX# 24145383)
100 E. Central Texas Expy.
Killeen, TX 76541
Main: 254-526-5688
Fax: 254-526-8204
aevans@carlsonattorneys.com
ebiedinger@carlsonattorneys.com
(*application for admission pro hac vice forthcoming*)

*ATTORNEYS FOR PLAINTIFF*

*SHARYN CLARK*